IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DIAZ AVIATION CORPORATION,

Plaintiff,

v.

PUERTO RICO PORTS AUTHORITY, et al.,

Defendants.

CIVIL NO. 09-1583 (CVR)

## OPINION AND ORDER

## INTRODUCTION

Plaintiff Díaz Aviation Corporation (hereafter "Díaz Aviation")[1] filed a Verified Amended Complaint against defendants Airport Aviation Corp., José Algarín, and Rafael Matos (hereafter referred jointly as "Airport Aviation"), among other co-defendants who were dismissed.[2] (Docket No. 121).

Plaintiff Díaz Aviation claimed defendant Airport Aviation and its employees, individual defendants Algarín and Matos, interfered with the operation of Díaz Aviation's business which it considers is interference with interstate commerce and, thus, have restricted trade at the Luis Muñoz Marín International Airport in Carolina, Puerto Rico (hereafter "LMMIA"), an alleged violation of the Sherman Act. The acts of said defendants were based on plaintiff's submission on the pleadings that Airport Aviation represented

---

[1] Plaintiff Díaz Aviation has been identified in the proceedings also as d/b/a Borinquen Air and as d/b/a Amber Air.

[2] Co-defendants Puerto Rico Ports Authority, (hereafter "Ports Authority"), Federico Sosa Román, Alvaro Pilar, Arnaldo Deleo, Edgar Sierra, Eric Gracia and Fernando Bonilla were also included in the Verified Amended Complaint but were dismissed as per Opinion and Order issued on July 27, 2010, Partial Judgment, and Order of September 3, 2010. (Docket Nos. 188, 191 and 201). Co-defendant Edwin Santana De La Rosa was also included in the Verified Amended Complaint but was dismissed on November 7, 2011 and Partial Judgment was entered. (Docket Nos. 274 and 276).

itself as the only entity authorized to serve the Armed Forces of the United States upon having a contract with the Defense Department to provide aviation fuel to its military planes. Plaintiff also raised having suffered tort/damages upon the loss of sales from defendants' interference with its business by taking away its clients, which resulted in plaintiff firing employees, cutting costs and reducing its business. As way of interference plaintiff submitted the allegation defendants used the Ports Authority to remove plaintiff's trucks from the airport, interfere with its business, initiate eviction actions which were resolved in plaintiff's favor by state courts, among others. (Docket No. 121).

On February 27, 28 and 29, 2012, the non-jury trial in this case was held on the pending claims under the Sherman Act and for damages under Article 1802 of the Puerto Rico Civil Code.[3] Plaintiff presented twenty one (21) witnesses on its behalf and seven (7) exhibits, in addition to a Joint Exhibit.[4] At the conclusion of the non-jury trial and presentation of all evidence by plaintiff and having rested its case, defendants Airport Aviation, Algarín and Matos moved for non-suit. Fed.R.Civ.P. 52.

After considering the evidence presented at trial, including the testimonies and documents, and assessing credibility, the Court finds plaintiff has not met its burden in this case.[5] The undisputed evidence showed plaintiff Díaz Aviation and defendant Airport Aviation have competed for a share of the aviation fuel dispensing to military aircrafts at

---

[3] Plaintiff waived a jury trial at the Pre-Trial Conference. (Docket No. 297).

[4] On the first day of trial, Sixto Díaz-Saldaña (president and owner of Díaz Aviation) informed the court he was going to continue legally representing plaintiff Díaz Aviation during the trial and he was also going to testify on behalf of plaintiff. Defendants renewed their objection to Mr. Díaz-Saldaña acting as counsel and as a witness. After hearing the arguments and having advised plaintiff it should have retained counsel, attorney Díaz-Saldaña was allowed to represent and testify on behalf of plaintiff.

[5] The testimonial evidence presented by plaintiff is undisputed and all witnesses were in essence consistent in their testimonies, thus reducing credibility determinations by the undersigned to a bare minimum.

the LMMIA. Defendant Airport Aviation operates pursuant to a contract with the Armed Forces and has not interfered with the operations of Díaz Aviation. As such, no Sherman Act violation, tort or damages have been established. Thus, the Court issues its findings of facts and conclusions of law.

**STANDARD UNDER FED.R.CIV.P. 52**

Federal Rule of Civil Procedure 52 provides in pertinent part as follows:

> (a) Findings and Conclusions.
>
> (1) *In General.* In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.
>
> .....
>
> (c) Judgment on Partial Findings. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

A district court in making bench findings did not have to account for every detail, discuss all of the evidence that supported each of the findings made, or respond individually to each evidentiary or factual contention made by the losing side. Fed.Rules Civ.Proc.Rule 52(a). *See* Addamax Corp. v. Open Software Foundation, Inc., 152 F.3d 48 (1st Cir. 1998).

## ANALYSIS

It is not clear from the Verified Amended Complaint under which Section of the Sherman Act plaintiff has made a claim. Thus, in an abundance of caution, we address Sections 1 and 2 of the Sherman Act.

### A. SHERMAN ACT, SECTION 1, CONSPIRACY TO RESTRAIN TRADE/COMMERCE.

Sherman Act, 15 U.S.C.A. §1, provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

Plaintiff's submission as to a Sherman claim arises from the alleged existence of a conspiracy. An interpretation and application of Section 1 of the Sherman Act, prohibits "(e)very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

The Sherman Act is a statute to be applied to mean what it says, which is not one to invalidating the entire body of commercial contract law or the regular competition in a free market. National Society of Professional Engineers v. United States, 435 U.S. 679, 687-88, 98 S.Ct. 1355 (1978). It is for this reason that the Act, in accordance with both its legislative history and common law antecedents, has been tempered by the Rule of Reason. *See* Standard Oil Co. v. United States, 221 U.S. 1, 60, 31 S.Ct. 502, 515 (1911). The Rule does not exempt restraints which may be argued to be reasonable or expedient, but rather focuses

on the reasonableness of the effect of the challenged restraint on competition. National Society of Professional Engineers v. United States, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363 (1978).

"The probability of successfully monopolizing a market is usually assessed through market share. The greater share a defendant initially controls, the greater the probability of achieving monopoly status." Hewlett-Packard Company v. Boston Scientific Corp., 77 F.Supp.2d 189, 198 (D. Mass. 1999) (citing Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America, 885 F.2d 683, 693-94 (10th Cir. 1989)). Thus, in order to state a claim under this section, a plaintiff must allege and prove that the defendant had market power in the relevant market to potentially achieve monopoly status. *See* CVD, Inc. v. Raytheon Co., 769 F.2d 842, 851 (1st Cir. 1985). It is plaintiff's burden to define and prove a viable relevant market, both geographically and by product. The principal factor in establishing a claim for attempted monopolization is defendant's market share in the relevant market. United States v. Microsoft, 253 F.3d 34, 81 (D.C. Cir. 2001). Also, as in any monopolization claim, plaintiff must prove that "significant" barriers to entry in the relevant market will make monopolization possible. *Id.* at 82-83. Other relevant factors include the strength and capacity of existing or potential competition, the concentration of the market, the trend towards greater or lesser concentration, the nature of the defendant's anticompetitive conduct, and the elasticity of consumer demand. *See* Spectrum Sports, Inc. v. McQuillan., 506 U.S. 447, 459, 113 S.Ct. 884 (1993).

An examination of the legality of any conduct alleged to be anticompetitive therefore necessitates a determination as to what the consequences of the conduct have been in the affected market.

Turning to this case, the evidence presented at trial shows the actions that plaintiff Díaz Aviation has assigned to defendants, as a possible violation of section 1, were mostly in regards to a third-party, the Ports Authority, which the evidence has not linked to any action by defendant Airport Aviation and the two co-defendants Algarín and Matos. The actions of defendant Airport Aviation's employees, co-defendants Algarín and Matos, to influence said non-party in their actions as to plaintiff, referring to instances of request for eviction from airport premises due to expiration of the lease contract and removal of permits from plaintiff's trucks were not presented. Rather, all that plaintiff submitted was that defendants Algarín and Matos at the time approached some military aircrafts that Díaz Aviation was servicing, at a location not identified, to provide the captain or main officer with a copy of the contract that was valid between defendant Airport Aviation and the Armed Forces.

The parties submitted jointly as Joint Exhibit I a copy of said contract that co-defendant AAS executed with the Defense Energy Support Center, acting on behalf of the U.S. Defense Air Logistics Agency (hereafter "DESC") (Contract No. SP0600-09-D-0076), to service into-plane fuel to military planes at LMMIA that covers a time period from April 1, 2009 to March 31, 2013. (Jointly Exhibit I). It is undisputed as well that, since 2002, plaintiff Díaz Aviation does not have a contract to provide plane services to military aircraft at the airport.

The evidence shows the captain of each aircraft was the ultimate decision maker as to whom serves fuel to its aircraft. Pursuant to the un-rebutted evidence presented at trial, this was done by the co-defendants in strict compliance with the obligations under the contract. Under the current contract, Airport Aviation services is to sell and serve fuel to a military airplane as long as Airport Aviation services is available, willing and capable of

selling the fuel at the moment. (Joint Exhibit I). Otherwise, another company may sell the fuel to the military plane and still Airport Aviation will be paid the service fee by the government, as evidenced by Exhibit 12. As a matter of fact, the evidence showed that on two (2) instances in 2012, plaintiff Díaz Aviation sold fuel to two (2) military planes.

As to the specific situation with a C-130 airplane on February 20, 2010, the undisputed evidence showed through the testimony of Mr. Eric Gracia, Assistant Director of Operations at the LMMIA, that the airplane was parked in an area where it was not allowed to be parked. As such, in compliance with the regulations of the Federal Aviation Administration, the plane was ordered to be moved by the Ports Authority for safety reasons to an area where it did not interrupt the operations of the airport. The captain of the airplane decided to relocate the plane. No evidence was presented as to defendants participating in any way in this situation.

As to co-defendant Matos, Mr. Díaz-Saldaña admitted under oath having no evidence to substantiate plaintiff's claims against co-defendant Matos.

As to co-defendant Algarín, Mr. Díaz-Saldaña admitted the only link to him is an email by Mr. Algarín to Mr. Gil Rosario on October 23, 2009, informing of an incident between defendant Airport Aviation and plaintiff's employees as to fueling of a military plane that led to the filing of a complaint with the Puerto Rico Police. As testified by Mr. Algarín, this email expressed some concerns as to possible accidents while fueling airplanes at the airport and did not request the alleged "throwing out" of plaintiff's trucks as plaintiff alleged. Thus, for safety concerns, Algarín requested the Ports Authority's intervention. (Exhibit 6).

It is pellucidly clear that plaintiff Díaz Aviation has totally failed to show the concerted action requirement as to the conspiracy that it alleges is in violation of the Sherman Act. No credible evidence of exclusionary practice was presented at trial or that defendants asserted to be holding an exclusive contract for the sale of jet fuel to the Armed Forces.

The Highest Court stated in Fisher v. City of Berkeley, Cal., 475 U.S. 260, 106 S. Ct. 1045 (1986) that it has always limited the reach of the Sherman Act provision, 15 U.S.C.A. § 1, to unreasonable restraints of trade effected by a contract, combination, or conspiracy between separate entities. Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability in the absence of agreement.

Additionally, plaintiff Díaz Aviation also failed to establish through competent evidence that even the acts attributed to the Ports Authority, once more, a non-party to this action, were contrary to law, although the eviction process concluded in favor of plaintiff upon payment of advanced lease payments. The evidence showed the removal of the permits to operate on the airport's ramps from plaintiff's trucks, which resulted in being denied access to airport premises, resulted from non-renewal of the permits after they expired and for security/safety reasons.

Even if we were to credit the acts alleged from the non-party Ports Authority as to eviction and removal of permits that may have hindered plaintiff's operation at the LMMIA's premises, such a restraint imposed unilaterally by a government entity does not become concerted action within the meaning of the Sherman Act simply because it has a

coercive effect upon the parties who must obey the law and the mere fact that all competing concessioneries must comply with the ordinance is not enough to establish a conspiracy among them.

Plaintiff offered a chain of emails (Exhibit 6) in relation to a C-130 plane serviced in October 22, 2009, as evidence of its claims under the Sherman Act against defendants. However, a review of Exhibit 6 and the testimonies in reference thereto, do not support plaintiff's allegations of an alleged conspiracy. As testified by Mr. Arnaldo Deleo (manager of the LMMIA), Airport Aviation operates at the airport, with the corresponding permits and authorizations of the Ports Authority. In relation to the email of Mr. Arnaldo Deleo to Mr. Díaz-Saldaña (Exhibit 6), Mr. Deleo testified plaintiff served a C-130 military plane on October 22, 2009 without having the required "fuel permit." Mr. Deleo informed Atty. Díaz-Saldaña the C-130 should have been serviced by Airport Aviation which had a contract in effect at the time with the Defense Department (Joint Exhibit I) and the required "fuel permit." As such, Mr. Deleo requested plaintiff to cease and desist, due to safety/security reasons, from interfering with another concessionaire (Airport Aviation) which was and still is duly authorized and with valid fuel permits to operate at the LMMIA. Thus, the concern as to this incident was one of security and/or safety of the operations at the LMMIA and nothing related to a conspiracy to limit trade and drive plaintiff out of business as it claims.

As to the portion of Exhibit 6 which contains a related email from Luis Varona of Airport Aviation to co-defendant Algarín, and as testified by Mr. Varona, the same also raises security concerns for plaintiff did not have the required fuel permit to fuel military planes. It also makes reference to the contract between Airport Aviation and the Department of Defense. (Joint Exhibit I).

Similarly plaintiff's attempt to introduce some sort of conspiracy as to the sale of aviation fuel at different prices to different businesses engaged in dispensing aircraft fuel at the LMMIA, failed to establish the concerted action to impose a higher price to plaintiff as part of a scheme to conspire and eliminate plaintiff's competition in the sale of aviation fuel. All that the evidence showed was that plaintiff's fuel was more expensive, reason for which some clients decided to acquire fuel from competing companies, such as Airport Aviation. An example being Roblex Aviation, whose owner, Mr. Roberto Rodríguez testified he no longer buys fuel from plaintiff as a business decision because Airport Aviation sells him the fuel for less and on time. As such, Roblex Aviation has $1,000.00 in savings per week.

Thus, no concerted action in restraint of trade or commerce was established. The mere allegation of a conspiracy between a third party gas/fuel company (*i.e.,* Esso or Total) and defendants was undertaken with purpose of allowing defendants to become the dominant marketer of competitive sources of aviation fuel to military planes was merely a conclusory statement from plaintiff, without any showing or evidence from which it could be construed a scheme to monopolize or an exclusionary practice.

The factual allegations in support of plaintiff's claim that defendants established itself as a dominant marketer of aviation fuel in the LMMIA and that defendants were trying to monopolize the market at the LMMIA were contradicted by plaintiff's own evidence as to the existence of numerous other companies which compete in this same field both in the Verified Amended Complaint (Docket No. 121) and the testimonies of plaintiff's witnesses Atty. Díaz-Saldaña and his son Atty. Rodrigo Díaz-Muñoz, as to the existence of seven (7) other companies. *See* Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549 (7th

Cir. 1980) (conclusory evidence of a conspiracy being only the naked statement that one existed).

Moreover, as properly argued by defendants, the allegations of the Verified Amended Complaint nor the evidence presented at trial by plaintiff identified a market. No expert witness testimony was presented to place the Court in a position to define plaintiff's market and sales, the market defendants supposedly attempted to monopolize, the share of the participants of the market, the share of plaintiff and defendants or the other participants that could demonstrate to the Court there is a valid Sherman Act claim.

Furthermore, no evidence of threats, violence, intimidation, or force by defendant or its employees Matos and Algarín, in support of the alleged concerted action, was presented. The evidence (including the testimony of multiple witnesses) showed the employees of Airport Aviation just offered a copy of the contract to the pilots of the military planes in a polite manner in compliance with the obligations under the contract. (Joint Exhibit I). To the contrary, the evidence demonstrated through the testimony of Mr. Michael Santiago, supervisor of operations of Airport Aviation, that Mr. Díaz-Saldaña, on one instance, used obscene language against him and he (Mr. Santiago) felt threatened by Mr. Díaz-Saldaña while offering defendants' services to a military plane under the contract.

Plaintiff Díaz Aviation brought forth twenty one (21) witnesses, seven (7) exhibits and a Joint Exhibit to try to show the alleged conspiracy or the monopolization attempt to no avail. No evidence showed the alleged agreement by defendants with the Ports Authority or any other party to drive plaintiff out of business. Plaintiff's evidence just established that Airport Aviation secured a contract which is in effect until the year 2013 with a federal agency, Defense Logistics Agency, (Joint Exhibit I) which plaintiff previously had in 1998-2002. Plaintiff fails to recognize this valid contract at present and the evidence showed it

sells fuel at a higher price than Airport Aviation under the contract which was obtained through procurement, competition and biding, to provide to the military fueling services at the most reasonable price available to the government. Plaintiff chose not to bid for said contract.

The witnesses and documents by plaintiff itself also demonstrate defendants were but attempting to inform to the captains of the military planes they had the contract with the Defense Department, were available to service their planes and honor the price in their contract, their obligation to be available and provide the fuel at said price. Ultimately, the decision from whom to buy the fuel was for the captain of the airplane.

A plaintiff alleging a conspiracy by defendants in violation of section 1 of the Sherman Act, must be able to show said defendants' actions were in agreement so as to damage its position in market and plaintiff has the burden of proving by preponderance of evidence that two or more companies (not the defendants as employees of the same company with each other) formed a common plan, scheme, or design to suppress actual competition in a relevant market, that they took steps in furtherance of that plan, and that those steps were designed to harm competition unreasonably. Sherman Anti-Trust Act, § 1, as amended, 15 U.S.C.A. § 1. Computer Identics Corp. v. Southern Pacific Co., 756 F.2d 200 (1st Cir. 1985).

In Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376 (1911), the Highest Court stated § 1 of the Sherman Act, 15 U.S.C.A. § 1, has been interpreted to proscribe only unreasonable restraints, and the accepted standard for testing whether a practice restrains trade in violation of § 1 is the rule of reason, pursuant to which the fact-finder weighs all of the circumstances of a case, including specific information about the relevant business and whether it has market power, as well as the restraint's history, nature,

and anti-competitive or pro-competitive effect. The Court stated that only those restraints that would always or almost always tend to restrict competition and decrease output are deemed unlawful per se.

There was no evidence whatsoever as to the above requirements showing that defendants agreed and/or conspired to engage in certain unreasonably anti-competitive activities in restraint of trade or commerce, in violation of Sherman Act § 1.

In evaluating these claims, one must keep in mind the special antitrust meaning of the terms "reasonable" and "unreasonable," a meaning that draws its content from the basic objectives of antitrust law's "rule of reason." The Supreme Court adopted the "rule of reason" in order to provide an intellectually, administratively, and legally satisfactory way to limit the Sherman Act's broad language, which, if taken literally, might forbid all agreements, good and bad, that were in any sense at all "in restraint of trade." *See* United States v. Trans–Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540 (1897); Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 60, 31 S.Ct. 502, 516 (1911).

Thus, the "rule of reason" limits the Act's literal words by forbidding only those arrangements the anticompetitive consequences of which outweigh their legitimate business justifications, 7 Areeda & Turner ¶ 1500 at 362–63, though certain anticompetitive practices, such as price fixing, so typically lack justification as to be *per se* unreasonable. 7 Areeda & Turner ¶ 1509.

"Anticompetitive", too, has a special meaning. It refers not to actions that merely injure individual competitors, that is, only plaintiff Díaz Aviation's business, but rather to actions that harm the competitive process. Brown Shoe Co. v. United States, 370 U.S. 294, 319–20, 328–34, 82 S.Ct. 1502, 1521, 1525–29 (1962); *see* Brunswick Corp. v. Pueblo

Bowl–O–Mat, Inc., 429 U.S. 477, 488–89, 97 S.Ct. 690, 697–98 (1977). The law assesses both harms and benefits in light of the Act's basic objectives, the protection of a competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods. *See* Interface Group, Inc. v. Massachusetts Port Authority, 816 F.2d 9, 11–12 (1st Cir.1987); 7 Areeda & Turner ¶ 1502.

The practices and agreements that plaintiff has characterized as anti-competitive and a violation of anti-trust, were not *per se* unreasonable, for plaintiff should have shown that the likely anti-competitive effects of these practices outweighs the business and safety/security justifications, or at least that the defendants might achieve any legitimate business objectives in a significantly less restrictive way. 7 Areeda & Turner ¶ 1505b. *See* Clamp-All Corp. v. Cast Iron Soil Pipe Institute, 851 F.2d 478 (1st Cir. 1988).

In sum, no evidence was presented to show defendants requested or entered into any agreement with Ports Authority or any of its officers to evict plaintiff Díaz Aviation from its leased premises at the airport or to restrain trade of aviation fueling operations at the LMMIA.

As such, plaintiff has failed to prove a valid claim under Section 1 of the Sherman Act.

**B. SHERMAN ACT, SECTION 2, ATTEMPT TO MONOPOLIZE.**

Section 2 of the Sherman Act provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by

> fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court. 15 U.S.C. §2.

The Supreme Court has defined monopolistic power as the power to control prices or exclude competition. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698 (1966); United States v. E.I. du Pont De Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994 (1956).

To sustain a claim under section 2 of the Sherman Act, if such was the claim since the Amended Complaint nor the evidence presented particularized the grounds for plaintiff's claim under Sherman, that is, that defendants have attempted to monopolize the market for such item, plaintiff must succeed in linking defendants with both an intent to monopolize and a pattern of activity creating a dangerous probability of monopolization. *See* U.S. v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 393, 76 S.Ct. 994 (1956); American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125 (1946); Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276 (1905).

To show monopolization in violation of Sherman Act, plaintiff must prove that defendant engaged in an act that helped create or maintain its alleged monopoly. Sherman Act; Fraser v. Major League Soccer, L.L.C., 284 F.3d 47 (1st Cir. 2002)

An intent to monopolize may be shown by direct evidence. United States v. Corn Products Ref. Co., 234 F. 964, 978 (S.D.N.Y.1916), appeal dismissed, 249 U.S. 621, 39 S.Ct. 291 (1919). The direct evidence of intent at most must show that defendant intended to eliminate plaintiff from the market. Intent may also be inferred from conduct, that is, indirect evidence. *See, e.g.*, Union Leader Corp. v. Newspapers of New England, Inc., 180 F.Supp. 125, 140 (D.Mass.1959), *aff'd in part*, 284 F.2d 582 (1st Cir. 1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747 (1961).

The alleged conduct cannot be said either to have a potential dangerous probability of successful monopolization. *See* Syracuse Broadcasting Co. v. Newhouse, 236 F.2d 522, 526 (2d Cir. 1956); Keco Industries, Inc. v. Borg-Warner Corp., 334 F.Supp. 1240, 1245 (M.D.Pa.1971); United States v. Charles Pfizer & Co., Inc., 245 F.Supp. 737, 739 (E.D.N.Y.1965).

Plaintiff's presentation of evidence at trial completely lacked evidence to establish the following elements of a §2 monopolization or attempted monopolization claim: (1) the relevant product market, (2) the share of the market held by defendants; (3) strength of the competitors that compose the market; (4) potential barriers to entry into the market; (5) market trends: or (6) any other fact indicative that monopolization might be a success.

As above explained, no credible evidence was presented by plaintiff that defendants have attempted to monopolize the market for jet fuel. Plaintiff did not succeed in linking defendants (Airport Aviation, Matos or Algarín) with both an intent to monopolize and a pattern of activity creating a dangerous probability of monopolization. To the contrary, plaintiff's evidence at the trial showed, as explained above, there are several other companies in the business of aviation fuel dealing at the LMMIA, for which plaintiff has not proven a section 2 attempt-to-monopolize violation. *See* George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547 (1st Cir. 1974).

Thus, no violation of Section 2 of the Sherman Act was established.

**B. PENDENT STATE TORT CLAIM UNDER ARTICLE 1802.**

Plaintiff Díaz Aviation seemly presented a supplemental claim under state tort even though no specific allegations of negligent acts or omissions were included in the Verified

Amended Complaint but just a mention of Article 1803 in the paragraph of "Jurisdiction". (Docket No. 121, p. 1).

Article 1802 of Puerto Rico's Civil Code, 31 P.R. Laws Ann. § 5141, provides for a right of action stemming from a person's negligence. Section 1802 provides that "[a] person who by an act or omission causes damage to another party through fault or negligence shall be obliged to repair the damage so done." 31 P.R. Laws Ann. § 5141.

Tort actions arise when there has been a violation of a right or an omission of a duty required by law. Under art. 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5141, the person who, through fault or negligence, causes damage to another shall be obliged to repair the damage so done. Thereunder, an injured party has the right to recover for the damages actually suffered and for lost profit. Zeno v. Vázquez Rosario, 106 D.P.R. 324, 326-29 (1977) (torts); Pérez v. Sampedro, 86 D.P.R. 526, 530 (1962) (contracts). The goal in damages actions is to put the injured party as nearly as possible where he would have been had the breach not occurred. Cappalli, *Tort Damages in Puerto Rico,* 46 Rev.Jur.U.P.R. 241, 242 (1977); I-II J. Puig Brutau, *Fundamentos de Derecho Civil* 512 (1976).

First, first there must be an action or breach of duty from which recovery follows. However, evidence of any torts action (as a result of negligence, acts or omission by defendants) claimed under P.R. Civil Code Section 1802 as to the corporation Díaz Aviation or defendants AAS, Algarín or Matos was not presented or established at trial as to any act or breach that defendants undertook and from which the damages, had they been

established or proven, may be recovered. Moreover, no credible evidence of causation or reliable evidence of damages was presented.

The attempt to establish damages to plaintiff's business with the testimonies in a vacuum of Atty. Díaz-Saldaña and his son, Atty. Rodrigo Díaz-Muñoz, without any expert witness and/or documentary evidence in support thereof (*i.e.,* financial statements, income tax returns, invoices, evidence of sales and loss of profit, among others) was unsuccessful and unreliable. The assertions of Atty. Díaz-Saldaña and Díaz-Muñoz were conclusory with minimal factual basis in support thereof and considered self-serving.

As such, plaintiff has failed to prove a claim for damages under Article 1802.

**CONCLUSION**

In view of the above, the oral motion for non-suit under Fed.R.Civ.P. 52 by defendants Airport Aviation, Algarín and Matos is GRANTED. All remaining claims under the Sherman Act and Article 1802 of the Puerto Rico Civil Code are DISMISSED WITH PREJUDICE.[6]

Judgment to be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 5th day of March 2012.

s/**CAMILLE L. VELEZ-RIVE**
**CAMILLE L. VELEZ-RIVE**
**UNITED STATES MAGISTRATE JUDGE**

6 An abbreviated version of this Opinion and Order was read in open court on February 29, 2012 after a recess was taken upon conclusion of the arguments on the Rule 52 motion.